# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00120-NYW

MICHAEL THOMPSON,

     Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33, for review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Michael Thompson's ("Plaintiff" or "Mr. Thompson") application for Disability Insurance Benefits ("DIB"). Pursuant to the Parties' consent [#14], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#22]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **REVERSES AND REMANDS** the Commissioner's decision.

## LEGAL STANDARDS

An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C.

§ 423(d)(2)(A).  The disabling impairment must last, or be expected to last, for at least 12

consecutive months.  *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).  Additionally, the

claimant must prove she was disabled prior to her date last insured.  *Flaherty v. Astrue*, 515 F.3d

1067, 1069 (10th Cir. 2007).

The Commissioner has developed a five-step evaluation process for determining whether

a claimant is disabled under the Act.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  These include:

1. Whether the claimant has engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment or combination of impairments;

3. Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4. Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5. Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).  *See also Williams v. Bowen*, 844

F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail).  "The claimant bears the

burden of proof through step four of the analysis[,]" while the Commissioner bears the burden of

proof at step five.  *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).  "If a determination

can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent

step is not necessary."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation

marks omitted).

In reviewing the Commissioner's final decision, the court limits its inquiry to whether

substantial evidence supports the final decision and whether the Commissioner applied the correct

legal standards. *See Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty*, 515 F.3d at 1070 (internal citation omitted); *accord Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) ("Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). "But in making this determination, [the court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016).

**ANALYSIS**

**I.      Background**

**A.      Medical and Non-Medical History**

Mr. Thompson, born May 8, 1968, alleges he became disabled March 10, 2016, at 47 years-of-age, due to severe persistent chronic asthma, diabetes mellitus, hypothyroidism, acid reflux, chronic sinusitis, osteoporosis, cardiomyopathy, and allergies. *See* [#11-6 at 181; #15 at 6].[1] When Mr. Thompson applied for disability benefits, he did not indicate illiteracy or a learning disability as a condition or conditions contributing to his disability. Rather, he reported that he could read and understand English and he could write more than his name in English, and a face-to-face interview also revealed no observed or perceived difficulties in Plaintiff's ability to read or write. [#11-6 at 177–78, 180]. Nevertheless, on appeal, Mr. Thompson focuses exclusively on his alleged learning disability that causes his functional illiteracy, and thus the court limits its discussion of the relevant medical and non-medical evidence to this condition.

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

Adams County Public Schools records indicate that Mr. Thompson has had learning challenges since he entered kindergarten in September of 1973. [#11-7 at 303]. His academic achievement was continuously below grade level. [*Id.*]. He was in a speech and language programs for three years and had been recommended for reading center help. [*Id.*]. In January of 1977, Mr. Thompson was referred to the JFK Center for an evaluation due to learning difficulties described as "slowness of movements and mental process." [*Id.*]. In fourth grade, Plaintiff's teacher reported that he was "functioning considerably below [fourth] grade level" and that his reading skills were "extremely poor." [*Id.*]. The teacher also commented that he had "serious skill deficiencies in reading and most written work." [*Id.* at 304]. A January 1978 Social Work Contact Summary noted Mr. Thompson's "learning disabilities continue to interfere with his academic progress and with his self-image." [*Id.*].

Upon re-entering the Denver Public Schools ("DPS") system at age ten, Plaintiff was recommended for placement in a special program due to academic performance. [*Id.* at 280]. Around this same time, Dr. Michael Hudson conducted a physical examination of Plaintiff and marked his neurological assessment as normal. [*Id.* at 281]. In 1980, as an 11-year-old fifth grader, Plaintiff's Individual Education Program ("IEP") assessed his educational needs as "reading skills, visual motor skills, and language expression." [*Id.* at 314].

In a 1981 Social Work Summary, Mr. Thompson was said to attend a specific school within DPS "in order to be in the IPCD [Identifiable Perceptual or Communicative Disorder] program" and his annual review recommendation was to continue in the program for a length of time to be determined by his new junior high school. [*Id.* at 326]. This summary also listed the following test scores and grades for his sixth-grade year: reading in the eleventh-percentile; vocabulary in the ninth-percentile; spelling in the fourteenth-percentile; language in the seventh-percentile; a

4

"D" in spelling; and no grade in reading because of Plaintiff's participation in the IPCD program. [*Id.*].

In 1985, Mr. Thompson was again referred for a 20-day placement in the IPCD program with DPS. [*Id.* at 322]. As a 16-year-old high school freshman, Mr. Thompson's IEP indicated a score in the first-percentile for reading and the third-percentile for written language according to the Woodcock-Johnson Psycho-Educational Battery.[2] [*Id.* at 292]. Additionally, the IEP indicated scores less than the first-percentile for perceptual speed and in the second-percentile for memory. [*Id.* at 297]. At this same time, a DPS Educational Assessment described a summary of Mr. Thompson's learning disabilities as "[w]eaknesses … in written language and reading" as a "result of poor memory and perceptual speed." [*Id.* at 296]. The test administrator, however, remarked that "[s]evere asthma and allergies combined with strong medication might have interfered with his test performance." [*Id.*]. Additionally, a writing test described Mr. Thompson's performance as, "[Plaintiff] wrote an extremely short, two sentence paragraph using simple sentences. His capitalization and punctuation were correct." [*Id.* at 297].

In 1986, as a 17-year-old high school sophomore, Plaintiff's IEP evaluated his reading level as "very low"—that of a second or third grader. [*Id.* at 287]. The IEP also evaluated his written language with a comment of "poor spelling." [*Id.*]. In 1987, as an 18-year-old high school junior, Plaintiff's IEP similarly evaluated his reading level as "approximately 2nd to 4th grade" and his written language as "approximately 3rd to 4th grade level." [*Id.* at 288]. In 1988, as a 19-year-old high school senior, Mr. Thompson's IEP assessed him as having the education and development of a second to fourth grader. [*Id.* at 282]. Mr. Thompson's IEP stated that his primary

---

[2] The Woodcock-Johnson Psycho-Educational Battery is designed to measure people's ability to, among other things, read and write. *Wilcutts v. Apfel*, 143 F.3d 1134, 1138 (8th Cir. 1998).

condition was being physically handicapped and that he had secondary conditions of learning disabilities and mild speech/language problems. [*Id.* at 283].

## B.     Procedural History

On March 18, 2016, Plaintiff filed his application for DIB. [#11-5 at 144–50]. The Social Security Administration initially denied Plaintiff's application administratively on May 10, 2016. *See* [#11-3 at 71]. Mr. Thompson submitted a request for a hearing before an Administrative Law Judge ("ALJ"), *see* [#11-4 at 85], which ALJ Erin Justice ("the ALJ") held on October 25, 2017, *see* [#11-2 at 39]. The ALJ received testimony from the Plaintiff and Vocational Expert Amanda Munzer (the "VE") at the hearing. *See generally* [#11-2].

Plaintiff first testified to his 26-year career with King Soopers. [*Id.* at 45–48]. He held jobs as courtesy clerk, maintenance worker, and shelf stocker—all of which required varying amounts of physical activity. [*Id.* at 46–48]. Plaintiff left King Soopers in March 2016 because of respiratory issues and because he was missing two-to-three weeks of work at a time. [*Id.* at 44].

Mr. Thompson also testified to his inability to read, explaining that he took special education courses in high school. [*Id.* at 51]. Upon questioning from his attorney, Mr. Thompson clarified that his reading problem is not with his eyesight but rather an issue with understanding and comprehending the words. [*Id.*]. Plaintiff further testified that he only graduated because the special education staff helped him complete the tests by reading them to him. [*Id.*]. While working for King Soopers, Mr. Thompson testified that he was only able to stock shelves because he could match numbers to numbers and pictures on the boxes to items on the shelves. [*Id.*]. Plaintiff also testified that when riding the bus, he asks the driver to tell him when to get off "[b]ecause [he] can't read the signs." [*Id.* at 52–53]. Mr. Thompson testified that he tries to hide the fact that he cannot read because "[he is] embarrassed of it." [*Id.* at 53]. He stated he does not use computers

6

and cannot have a job that requires use of a computer because he cannot read; he also testified that

he does not have or use a smart phone. [*Id.* at 60–61].

The ALJ then took the testimony of the VE. [*Id.* at 62–70]. The VE summarized Mr.

Thompson's past relevant work to include courtesy clerk, a specific vocational preparation

("SVP")[3] of 2, and a light job; floor waxer, an SVP of 2, and a medium job; and stock clerk, an

SVP of 4, and a medium job. [*Id.* at 63].

The VE then testified that a hypothetical individual of Mr. Thompson's age, education, and

past work who can occasionally lift 20 pounds, frequently lift ten pounds; stand/walk for a total of

two hours and sit for six hours; and occasionally climb ramps, stairs, ladders, ropes, and scaffolds,

cannot perform any of Mr. Thompson's past work. [*Id.* at 63]. The VE testified that there are

three light jobs this hypothetical individual could perform: an electric assembly worker, a callout

clerk, and a sewing machine operator—all with an SVP of 2. [*Id.* at 63–64]. The VE testified that

an identical hypothetical individual with the added limitation of one unscheduled break of one

hour each day was not capable of performing Plaintiff's past work or any job in the national

economy. [*Id.* at 64]. The VE testified that her testimony was consistent with the Dictionary of

Occupational Titles, supplemented by her ten years of experience in the field of vocational

rehabilitation. [*Id.* at 65].

Upon questioning from Mr. Thompson's attorney, the VE testified that there are

approximately 900 electronic assembly worker jobs, 150 callout clerk positions, and 500 sewing

---

[3] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

machine operators in the State of Colorado. [*Id.* at 66]. The VE testified that she reduced the electric assembly worker jobs by 50-percent because the other two positions are light and done while seated. [*Id.* at 66–67]. The VE then testified that she would do a further reduction to the potential number of all three positions based on the hypothetical claimant's illiteracy. [*Id.* at 67]. The VE testified that she would do a 75-percent reduction on the callout clerk and 25-percent reductions to both sewing machine operator and electronic assembly worker because they do not require reading as much as following a blueprint. [*Id.*]. The VE testified that, in the end, there are 675 electronic assembly worker positions, 37 callout clerk positions, and 400 sewing machine operator positions available that this hypothetical claimant could perform in the State of Colorado. [*Id.* at 67–68].

At the end of the hearing, Mr. Thompson's attorney informed the ALJ that Mr. Thompson had an additional witness prepared to testify to Mr. Thompson's illiteracy; however, the ALJ responded, "If it's just as to the literacy issue I'm – you don't need another witness for that." [*Id.* at 65]. The hearing then concluded.

On February 13, 2018, the ALJ issued a decision denying Plaintiff's application for DIB. [*Id.* at 23–38]. The ALJ concluded that Mr. Thompson met the insured status requirements of the Act through December 31, 2021 and that he:

1.  had not engaged in substantial gainful activity since the alleged onset date;

2.  had the severe impairment of asthma (and no non-severe impairments);

3.  had no impairment or combination of impairments that met or medically equaled a listing;

4.  had the RFC to perform light work, subject to various limitations, and could not perform his past relevant work; and

5.  Could perform jobs that existed in the national economy.

[*Id.* at 28–29]. Thus, at step five of the analysis the ALJ determined Mr. Thompson was not disabled. [*Id.* at 29–32]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner. *See* [*id.* at 1–7]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on June 29, 2018, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

On appeal, Mr. Thompson raises three issues regarding the ALJ's decision: (1) the ALJ erred at step two by failing to consider Plaintiff's learning disorder; (2) the ALJ erred in assessing Plaintiff's RFC; and (3) the ALJ erred in not evaluating how illiteracy erodes the adjusted number of jobs in the national economy. [#15 at 6]. Because the court concludes that the first issue necessitates remand, it focuses solely on that issue. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

## II.     Step Two

At step two, the Commissioner determines whether a claimant has any severe or non-severe physical or mental impairments. *See Williams*, 844 F.2d at 750. "To find a 'severe' impairment at step two requires only a threshold showing that the claimant's impairment has 'more than a minimal effect on [her] ability to do basic work activities.'" *Covington v. Colvin*, 678 Fed App'x 660, 664 (10th Cir. 2017) (quoting *Williams*, 844 F.2d at 751). Plaintiff bears the burden of establishing a severe medically determinable impairment at step two, but "the claimant must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *see also* 20 C.F.R. § 404.1520(a)(4)(ii); SSR 85-28, 1985 WL 56856, at *3 (providing that a step-two finding of "non-severe" impairment is only to be made where "medical

evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered").

If, however, an ALJ concludes that an ailment is not a medically determinable impairment, the ALJ need not consider the ailment at subsequent steps. *See Cook v. Colvin*, No. CV 15-1164-JWL, 2016 WL 1312520, at \*4 (D. Kan. Apr. 4, 2016) ("Limitations attributed to impairments which are medically determinable but are not severe must be considered at later steps in the evaluation, whereas alleged limitations attributable to impairments which are not medically determinable must not be considered at later steps."). Plaintiff thus bears the burden of establishing a medically determinable impairment, whether physical or mental, at step two. *See* 20 C.F.R. § 404.1521. To do so, Mr. Thompson's impairment(s) must "result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," meaning Mr. Thompson's learning disability "must be established by objective medical evidence from an acceptable medical source." *Id. See also id.* § 404.1520a(a)-(b) (imposing the same requirements for mental impairments). When considering medically determinable mental impairments, the ALJ must first determine whether such an impairment exists based on the claimant's "symptoms, signs, and laboratory findings"; then the ALJ must "rate the degree of functional limitation resulting from the impairment(s)"; and finally the ALJ must determine the severity of the impairment(s). *Id.* § 404.1520a(b)-(d); *see also id.* § 404.1520a(e)(2) ("[T]he written decision must incorporate the pertinent findings and conclusions based on the technique."). The finding of a medically determinable mental impairment requires the ALJ to consider that impairment (severe or not) at subsequent steps. *See Wells v. Colvin*, 727 F.3d 1061, 1064 (10th Cir. 2013) (internal citations omitted).

Here, the ALJ found the severe impairment of asthma. Plaintiff, however, takes issue with the ALJ's lack of consideration of his learning disability at step two, arguing the ALJ should have found his learning disability a severe or non-severe medically determinable impairment. Doing so, Plaintiff argues, would have required the ALJ to consider the learning disability when formulating Plaintiff's RFC and when calculating the number of jobs available for Mr. Thompson to perform in the national economy. [#18 at 3–7]. The Commissioner responds that Plaintiff failed to point to evidence that could support the existence of any medically determinable impairment that the ALJ overlooked and the record does not support Plaintiff's allegation of "functional illiteracy." [#16 at 5]. For the following reasons, I respectfully disagree with the Commissioner.

Throughout her entire decision, the ALJ mentioned mental impairments only once while discrediting licensed clinical social worker Diane Eberle's diagnostic impression of "irritability/anger." [#11-2 at 29]. The ALJ stated, "[t]he record does not show a confirmation of this diagnostic impression by an acceptable medical source, and does not show any other diagnosis of a mental impairment by an acceptable medical source." [*Id.*]. Nowhere does the ALJ consider Mr. Thompson's learning disability. Further, and contrary to the Commissioner's contentions, substantial evidence in the longitudinal record demonstrates a documented history of learning disability that manifested as "functional illiteracy" in adulthood. *See, e.g.*, [#11-2 at 53, 60, 65–66; #11-7 at 280, 296, 304, 326]. Indeed, the court agrees with Plaintiff that "[t]he illiteracy of the Plaintiff here is not the impairment itself; the illiteracy is the most significant manifestation of the impairment, the impairment being the childhood learning disorder." [#18 at 5].

In the instant case, the record is replete with mentions of Mr. Thompson's alleged learning disability. *See, e.g.*, [#11-2 at 30, 51–53, 65; #11-7 at 282, 292, 296–97, 303, 326]. For instance, Plaintiff's fourth-grade teacher reported that he was "functioning considerably below [fourth]

11

grade level" and that his reading skills were "extremely poor"; in sixth grade Plaintiff participated in the Identifiable Perceptual or Communicative Disorder program and scored extremely low on his reading, vocabulary, spelling, and language aptitude tests; in ninth grade Mr. Thompson's IEP indicated a score in the first-percentile for reading, the third-percentile for written language, less than the first-percentile for perceptual speed, and the second-percentile for memory; in twelfth grade Mr. Thompson's IEP assessed him as having the education and development of a second to fourth grader and stated he had secondary conditions of learning disabilities and mild speech/language problems. *See* [#11-7 at 282-83, 292, 297, 303, 326]. At the hearing, Plaintiff testified that he cannot read because he cannot comprehend or understand the words, that he took special education courses in high school, and that he only graduated because the special education staff read him the test questions aloud. [#11-2 at 51]. Plaintiff further testified that he is embarrassed by the fact he cannot read, that he cannot use a computer or smart phone, and that he asks the bus driver to tell him when to get off "[b]ecause he can't read the signs." [*Id.* at 52–53]. Plaintiff also intended to call a witness to testify to his illiteracy but the ALJ demurred, stating, "[i]f it's just as to the literacy issue … you don't need another witness for that." [*Id.* at 65].

The ALJ offered no discussion of the relevant medical evidence supporting Plaintiff's claimed learning disability. And much of the recounted evidence not only suggests a medically determinable mental impairment, but also tracks the requirements for meeting the listing for intellectual disorders under Listing 12.05. *See* C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(B)(4)(a)-(b) (Listing 12.05) (characterizing intellectual disorder as (a) "significantly subaverage general intellectual functioning, significant deficits in current adaptive functioning, and manifestation of the disorder before age 22. Signs may include, but are not limited to, poor conceptual, social, or practical skills evident in your adaptive functioning. . . . (b) The disorder that

12

we evaluate in this category may be described in the evidence as intellectual disability, intellectual developmental disorder, or historically used terms such as 'mental retardation.'"); *see also id.* § 12.00(C)(3)-(4)(a) (explaining that evidence demonstrating a mental disorder includes evidence from the claimant and people the claimant knows as well as IEPs, "comprehensive evaluation reports, school-related therapy progress notes, information from your teachers about how you function in a classroom setting, and information about any special services or accommodations you receive at school.").[4]

Although "[a]n ALJ is not required to discuss every piece of evidence," she "must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects," *Clifton Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996), and cannot simply ignore evidence that does not support her decision, *see Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). The ALJ's failure in this regard similarly affected her determinations at subsequent steps. And to the extent the ALJ believes Plaintiff's medical records are inconclusive, the ALJ should consider the need for a consultative examination to properly resolve Mr. Thompson's disability claim. *See Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997). In sum, it was reversible error for the ALJ not to have considered Plaintiff's potential mental impairments at step two.

## CONCLUSION

For the reasons stated herein, the court **REVERSES** the Commissioner's final decision and **REMANDS** this matter for further proceedings consistent with this Memorandum Opinion and Order.

---

[4] The court expresses no opinion as to whether Plaintiff meets or medically equals Listing 12.05, and merely offers this listing as further support for its conclusion that the medical evidence supports Plaintiff's claimed medically determinable mental impairment.

DATED:  December 5, 2019                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge